Filed 6/15/21  Townsend v. Olivo CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| JEFFREY TOWNSEND, | |
| Plaintiff and Respondent, | E073183 |
| v. | (Super.Ct.No. RIC1611099) |
| JOSE OLIVO et al, | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Daniel A. Ottolia, Judge.

Affirmed in part; reversed in part with directions.

MacDonald & Cody, Scott L. Macdonald and Douglas M. Carasso for Defendants

and Appellants.

Lari-Joni & Bassell, Torsten Bassell; Torkzadeh Law Firm and Reza Torkzadeh

for Plaintiff and Respondent.

Plaintiff and respondent Jefferey Townsend was riding his motorcycle on

Chapman Avenue in Fullerton when he collided with defendant and appellant Maria

Olivo, who was making a left turn from Chapman Avenue onto Acacia Avenue.

1

Townsend suffered severe injury to his leg. After a jury trial, the jury found that Maria[1] was 60 percent at fault for the accident and Townsend was 40 percent at fault. The jury awarded Townsend $1,140,000 in future medical costs, which included the costs of a prosthetic device for the remainder of his life should Townsend decide to amputate his leg in the future.

On appeal, Maria contends (1) the trial court erred by giving a special instruction on left turns while driving a vehicle, which essentially allowed the jury to find her liable for Townsend's injuries under a strict liability standard; and (2) an orthopedic surgeon called by Townsend as an expert was improperly allowed to testify about the cost of prosthetics as he was not qualified to render such an opinion and relied on improper hearsay, which he relayed to the jury in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).

**FACTUAL AND PROCEDURAL HISTORY**

A.     PROCEDURAL HISTORY

On August 26, 2016, Townsend filed a lawsuit in Riverside County Superior Court against Jose Olivo and Maria alleging negligence, negligence per se, negligent entrustment and statutory negligent entrustment of a motor vehicle. Townsend alleged that on July 13, 2016, Maria, who was driving a 2007 Toyota belonging to Jose, made a left turn directly into the path of travel of Townsend, who was driving a motorcycle. As a result he suffered catastrophic injuries. Townsend alleged that Maria violated Vehicle

---

[1] We refer to Jose and Maria by their first names for clarity due to a shared last name. No disrespect is intended.

2

Code sections 21658, subdivision (a), 21655.8, subdivision (a), 21801, subdivision (A), 22350 and 21070. The violation of the aforementioned statutes directly and proximately caused the collision. It was alleged against Jose that he violated Vehicle Code section 14606 by entrusting his vehicle with Maria, who was not fit to drive the motor vehicle.

After a jury trial, the jury entered a verdict finding that Maria was negligent and that her negligence was a substantial factor in causing harm to Townsend. He was awarded total damages of $3,500,000. This included future medical expenses in the amount of $1,140,000 for possible amputation and prosthetic devices. The jury also found that Townsend was negligent and a substantial factor in causing his harm. They found Maria 60 percent responsible and Townsend 40 percent responsible. The judgment for damages to Townsend totaled $2,100,000.

B.     FACTUAL HISTORY

1.     *ACCIDENT*

Townsend first purchased a motorcycle in 2011 and took a basic rider course. He took an advanced course three months later. These were week-long courses that were full days. In July 2016, Townsend was enrolled as a full-time student at Fullerton College studying Kinesiology. He had been enrolled at Fullerton College for two years prior to the accident in 2016. At the time of the accident, he was riding a 2015 Harley Davidson Iron 883.

Prior to July 13, 2016, Townsend had gone through the intersection at Chapman and Acacia Avenues in Fullerton 50 to 100 times on his way to school. On July 13 he was riding his motorcycle east on Chapman Avenue. There were a total of four lanes on

3

Chapman Avenue; two lanes in each direction. The number one lane for each direction was the lane closest to the middle of the street. Townsend was traveling in the number two lane going east on Chapman when he approached Acacia Avenue. It was clear and the roads were dry.

Townsend was moving with the flow of traffic on Chapman Avenue; he estimated he was traveling 40 miles per hour. When he approached the intersection at Acacia Avenue, the light was green. Townsend crossed the limit line at the intersection and the light turned yellow. He did not have time to stop so he continued straight, colliding with Maria's vehicle. He did not have time to brake. He did not see Maria's car before impact; he only saw a flash.

Townsend did not recall that he was lane splitting prior to entering the intersection but he was unconscious after the accident and he had a hard time fully recalling that day. However, it was Townsend's custom when riding on side streets, rather than the freeway, to not engage in lane splitting. He also was not in a hurry and did not have a reason to weave in and out of traffic. He could not recall if there was a car in front of him when he reached the intersection. Townsend did not know, if there were cars in front of him, if they were stopped or moving. He "firmly" believed the light was not red when he crossed the limit line.

Everything went black after the collision. The next memory he had was waking up in the hospital at University of California at Irvine Medical Center (UCI Medical Center).

4

On July 13, 2016, around 2:00 p.m., Maria Olivo was waiting to make a left turn at the intersection of Chapman Avenue and Acacia Avenue in Fullerton. She was listening to the radio. She did not hear a motorcycle. The first time she saw the motorcycle was at the time of impact. She had no idea how fast the motorcycle was traveling. She did not see the motorcycle in the other lanes or see it go around another vehicle. The vehicles coming toward her in the opposing lanes were slowing down but not stopped when she made the left turn on the yellow light. Maria did not believe that the motorcycle ran a red light.

2.    *MEDICAL TESTIMONY*

The jury viewed Townsend's leg. Townsend recalled that he had rods and pins put in his leg along with a device that was put on the outside of the leg to help stabilize the rods. He had the rods and pins and the device to hold them in place for 14 to 15 months after the accident. He had three or four surgeries in July 2016. He had to drop his classes at Fullerton College. He was hospitalized until mid-August 2016. He participated in painful physical therapy to keep blood flowing to his leg. He had trouble completing everyday tasks, including cooking and personal hygiene. In 2017, he had additional surgeries. He had extensive scarring on his leg. He returned to school in the Fall of 2017. He was able to drive to school but was still in pain. He used a cane. He took medications to help with the pain.

Townsend was charged medical expenses and ambulance charges totaling $265,072.43. Later Townsend was treated at a Veteran's Administration Hospital (VA) because he had been in the United States Marine Corps. He was involved in all types of

5

athletic activities prior to the accident.  He had a hard time working and had to move to Arizona because it was cheaper.

Dr. John Scolaro was an orthopedic surgeon employed at UCI and he treated Townsend after the accident.  He specialized in traumatic injuries.  Townsend had an open tibia (shin bone) fracture.  There was a large area of bone loss in his tibia.  There was also vascular injury that was concerning as to whether the leg was getting enough blood.  Small pieces of bone had to be removed from Townsend's tibia.  Pins and rods were put in place and an external fixator was put on the leg to stabilize the pins and rods.  His blood flow to the leg was improved once the bones were put back in place.  Townsend had a lot of tissue and muscular loss where the bone protruded out of his body.  In order to have enough skin to cover the wound, Dr. Scolaro had to shorten the bone in the leg.  He was able to get close to normal leg alignment.  Townsend had a permanent rod in his leg.  Townsend had a total of four to six surgeries.  The final surgery was removal of the external fixator, which was holding the rod in place.

Dr. Scolaro expected long-term pain and stiffness around the leg.  Townsend would need long-term physical therapy.  Dr. Scolaro indicated that amputation was a possibility from the onset of Townsend's injury but it was not recommended at the time by Dr. Scolaro; amputation may later be necessary due to pain.

Dr. William Schobert was an orthopedic surgeon who specialized in sports medicine.  He had performed one amputation.  Dr. Schobert stated that in order to prepare for trial, he had to get "up to date" on prosthetics.  He spoke with the vice president of Ossur Medical, one of the major producers of prosthetics.  Dr. Schobert spoke with him

6

to get an idea of what Townsend would need, how often Townsend would need to replace his prosthetic devices, and the costs involved. Dr. Schobert also spoke with a "local prosthetist" who talked to him about fitting and day-to-day issues with a prosthetic. He also researched cost.

Dr. Schobert reviewed all of Townsend's medical records. Dr. Schobert's main focus in examining Townsend was that Townsend had stiffness and problems in his foot and ankle. Dr. Schobert noted some of his bones were touching each other, which could cause future problems. Townsend was developing arthritis in his ankle, which would also cause him problems. Dr. Schobert did not see his ankle and foot getting better over time; it would degrade over time. Dr. Schobert recommended amputation. A surgery on the ankle would not be successful. Most patients did "extraordinarily well" with amputation and were able to get back to their normal lives.

Dr. Schobert had researched tibia injuries and if it appeared there would be foot and ankle problems, an amputation was best. If surgery on Townsend's ankle was attempted, it would cost approximately $200,000. The cost of just the amputation would be approximately $20,000.

Dr. Schobert had researched the cost of prosthetics and what Townsend would need. Dr. Schobert stated that Townsend would need at least two devices because they only lasted for two years. He received the cost from the manufacturer, which he confirmed with a local prosthetist. Dr. Schobert's opinion regarding the cost of Townsend's prosthetics was $22,000 each year for Townsend's lifetime.

Dr. Schobert admitted he was not an expert in the area of prosthetic devices. The only knowledge he had was from research conducted specifically for this case. He made several phone calls and researched the matter for two hours. He believed that Townsend had been researching amputation. He believed that with amputation, Townsend could pursue a career as a physician's assistant or physical therapist. Dr. Schobert agreed amputation should be the last resort, but stated "I think we're getting there though."

Townsend recalled that he was seen by Dr. Schobert, who highly recommended that he amputate his leg. Townsend was told that if he kept the leg, he would be extremely limited in what he could do the remainder of his life, and would always be in pain. A prosthetic would give him a chance of living a full life and being without pain.

### 3.     *ACCIDENT RECONSTRUCTION*

Joseph Gilbert Yates was an expert in motor vehicle accident reconstruction. He was retained in October 2018 to investigate the accident between Maria and Townsend. He reviewed the depositions of the parties, a traffic collision report, and photographs of the involved vehicles. He also visited the scene. He took sequential photographs while driving through the intersection. He also drove a motorcycle through the intersection.

Based on his review, he estimated the motorcycle was traveling 40 miles per hour when it impacted Maria's vehicle. This would amount to movement of the motorcycle 60 feet each second. Yates stated that the more aggressive a motorcyclist had to stop, the greater the chance the bike would fall. When Maria started to turn, Yates estimated that Townsend was 193.6 feet from the impact area. There was no evidence that Townsend was speeding. There was no physical evidence that Townsend was lane splitting. Yates

8

believed that Townsend entered the intersection on a yellow light. The yellow light at the intersection stayed yellow for four and one-half seconds. Maria was traveling 10 miles an hour in making her turn and Townsend was traveling 40 miles an hour. Maria waited one second when the light turned yellow to make her turn. The accident occurred in the middle of the intersection.

4. *DEFENSE*

Dr. Neeraj Gupta was an orthopedic surgeon. He examined Townsend on August 8, 2017. He also reviewed medical records from UCI Medical Center and the VA hospital. He examined CT scans and MRI images taken of Townsend. He also reviewed Dr. Schobert's deposition. Dr. Gupta approved of the surgeries performed to rehabilitate Townsend's leg. Townsend was still on crutches. His left knee had regular range of motion. He had adequate blood supply to the leg. In reviewing records after their meeting, he discovered the tibia bone had healed. Dr. Gupta did not recommend a below knee amputation. There were further treatments available to help Townsend with pain in his ankle. An ankle surgery would cost approximately $20,000.

Dr. Gupta estimated that the cost of amputation would be $30,000 for the surgery; this did not include the cost of prosthetic devices. There were possibilities of further problems with the amputation, including phantom pain and correct fitting of the prosthetic device. Amputation was a last resort in Dr. Gupta's opinion. He was unsure how many prosthetic legs Townsend would need over his lifetime. Dr. Gupta indicated that no one at UCI Medical Center or the VA had suggested amputation. Dr. Gupta

9

referred to a study in which it was determined that at two and seven years the functionality between limb salvage and amputation was the same.

Stein Husher was an accident reconstruction expert. He had extensive experience in motorcycle accidents. He visited the accident scene in May 2017 and reviewed all the reports. He only viewed photographs of Maria's car; the motorcycle photographs were not available. He estimated that the motorcycle was traveling at a speed of between 41 to 49 miles an hour. The point of impact was 40 feet from the first line of the crosswalk for Townsend. Maria's vehicle was traveling 10 miles an hour.

The yellow signal light for Townsend would have lasted four and one-half seconds. It would have taken the motorcycle 82 feet to stop if traveling 40 miles an hour. Time for the turn for Maria was between 2.8 to 9.6 seconds. The impact was in the middle of the intersection. Assuming an additional one second reaction time, it would take Townsend 142 feet to stop.

Police Corporal Steve Bailor had been a motorcycle officer for the City of Fullerton for 23 years. He responded to the accident scene. The intersection of Acacia and Chapman Avenues had two lanes of traffic for east and west on Chapman, and a left-hand turn lane on each side. The posted speed limit was 40 miles an hour. A third vehicle driven by Kevin Decker was involved in the accident; his vehicle had come to a stop in the crosswalk on Acacia Avenue. Corporal Bailor spoke with Maria and Decker. Townsend was unconscious when Corporal Bailor arrived at the scene.

Maria told Corporal Bailor that she was traveling westbound on Chapman Avenue and entered the left-hand turn lane. She then went into the intersection waiting for eastbound traffic to stop. There were cars in both the number one and two lanes, which slowed down, so she started her turn. The motorcycle then impacted her. She never saw the motorcycle until it hit her car. There was damage to the front passenger's side of Maria's car. Decker's vehicle had some damage to its front end. Townsend told another officer he was traveling eastbound on Chapman Avenue at 40 miles an hour when he got hit in the intersection. The light turned yellow as he got into the intersection. Townsend indicated he was unable to stop and proceeded through the intersection.

Decker told Corporal Bailor he was beginning a right-hand turn onto east Chapman Avenue when he heard a motorcycle approaching. Decker said it sounded like the motorcycle was accelerating and the traffic signal phased to red before the motorcycle entered the intersection. Decker estimated the motorcycle was traveling at 40 to 50 miles an hour. The cars in the number one and two lanes going eastbound had stopped and the motorcycle was splitting lanes between the two cars.[2]

Dr. Anthony Stein was an expert on human factors, which was the study of how people interact in their environment, including perception and reaction times. He especially looked at factors in transportation. He was hired to do a human factors analysis of the accident. He reviewed all the records and visited the scene.

---

[2] Corporal Bailor admitted that in his police report, there was nothing documenting that Decker actually saw two cars in the eastbound lanes.(RT 703, 706-707}

11

It was his understanding that Maria started her left-hand turn when the light turned yellow. Maria had observed the two vehicles coming to a stop in the east lanes of Chapman. It would take her less than one second to perceive the other cars had stopped. It would take another 1.4 seconds for her to start accelerating through the turn. It was 2.5 seconds from the time the light turned yellow until she collided with Townsend. Dr. Stein noted that Maria would have shifted her focus as she turned from straight ahead to the left where she was going. As such, she would not have seen the motorcycle until time of impact. Once the motorcycle passed the two cars, it was only one second before impact. Maria would have not been able to stop in time even if she saw the motorcycle. Townsend should have been able to stop before impact based on the slowing cars in front of him and distance from the intersection when Maria turned.

Decker worked for an ambulance service, driving to different locations with supplies in a company vehicle. He was in the vehicle preparing to make a right-hand turn onto east Chapman Avenue at the time of the accident between Townsend and Maria. The light was red. He was stopped before the crosswalk. He observed the light for west and east Chapman Avenue turn to yellow. Maria's car was still in the intersection. The light turned red and Maria still had not turned as there were cars going through. He heard a motorcycle. He looked to his left and saw a motorcycle three to four car lengths from the intersection.[3] There were vehicles stopped in front of the motorcycle.

---

[3] Decker previously testified that he saw the motorcycle one car length from the intersection.

The motorcycle kept going at least 50 miles an hour in between the cars and entered the intersection on the red light.[4] Maria had started to turn and the motorcycle collided with Maria's vehicle. Maria did not start her turn until the light turned red. Townsend was thrown from the motorcycle and the motorcycle hit Decker's vehicle. Decker called 911. Townsend did not attempt to stop. The light was red for two seconds when he entered the intersection. Decker acknowledged the police report did not mention that he said Townsend was lane splitting prior to the accident.

Maria testified that she was 20 years old at the time of the accident and she was a student at California State University at Fullerton. She had been driving for 10 months. She moved into the left turn lane going west on Chapman Avenue. The signal light turned yellow prior to her starting her left-hand turn. She observed one car in each lane of eastbound Chapman Avenue. She did not recall if there were vehicles behind those first vehicles. She observed that the vehicles started to slow down approaching the intersection. She did not see Townsend's motorcycle before she began her left-hand turn. She switched her focus to Acacia Avenue to make sure there were no pedestrians. The impact occurred while she was making her left-hand turn onto Acacia. The impact was to the front of her vehicle. She only recalled seeing some type of movement before the impact. The light was yellow for two seconds before she started her turn. She did not look back at the light so was unsure if it turned red during her turn. Maria never talked to Townsend that day.

---

[4] Decker testified at his deposition that Townsend was going 40 to 45 miles per hour.

## DISCUSSION

A. <u>INSTRUCTIONAL ERROR</u>

Maria contends the trial court erred by giving special instruction No. 1 (Special Instruction). She contends that the instruction told the jury that she was "strictly liable" for any collision in the intersection with any approaching vehicle because the approaching vehicle had the right of way throughout the time she made her left turn. The error was prejudicial warranting a new trial.

1. *ADDITIONAL FACTUAL BACKGROUND*

During the discussion of the instructions, Townsend requested a negligence per se instruction. The trial court stated that it intended to give the instructions for Vehicle Code section 21801. The trial court did not intend to instruct on negligence per se.

Townsend requested the Special Instruction as follows: "Vehicle Code Section 21801(a) requires the driver of a vehicle intending to turn left at an intersection to yield the right-of-way to all vehicles approaching the opposite direction which are close enough to constitute a hazard at any time during the turning movement. If any approaching vehicle is close enough to constitute a hazard at any time during the turning movement, then the left-turning driver continues to have a duty to yield the right-of-way to that approaching vehicle even if other vehicles yielded their right-of-way to the left-turning driver." The instruction was drawn from *In re Kirk* (1962) 202 Cal.App.2d 288 (*Kirk*) and *Sesler v. Ghumann* (1990) 219 Cal.App.3d 218 (*Sesler*).

In assessing the Special Instruction, the court indicated it had read the *Sesler* and *Kirk* cases. The trial court noted the instant case was different because in those cases, the driver making the left-hand turn had been waived to go by another car coming in the opposite direction, but was then hit by a car approaching from the lane next to the person who had waved the driver to turn. Defense counsel objected to the instruction that Maria had a duty throughout the entire turn to yield to any hazard; the motorcycle came out of nowhere.

The trial court noted that left turns were inherently dangerous. The trial court felt that the Special Instruction was "an accurate recitation of the law" and planned to give it. The trial court also agreed to read the exact language of Vehicle Code section 21801 to the jury. Maria's counsel objected and argued that only California Civil Jury Instruction (CACI) No. 704; and Vehicle Code section 21801, subdivisions (a), and (b), should be read to the jury. Maria's counsel argued it was an inaccurate description of Maria's duty. It gave the jury the impression that despite the motorcycle running the red light, she had a duty to yield. Townsend could argue the theory but an instruction was inappropriate. Townsend's counsel argued the law required the Special Instruction. The trial court stated it was reticent to give a special instruction, but in this particular case, it was properly given. The trial court agreed that CACI No. 704 would also be given. The jury would be given the Special Instruction, it would be read Vehicle Code section 21801, and CACI No. 704. The jury would also be instructed that lane splitting was not barred by the Vehicle Code.

15

The jury was instructed with the Special Instruction as detailed, *ante.* In addition, they were instructed, "When the law requires a driver to 'yield the right-of-way' to another vehicle, this means that the driver must let the other vehicle go first. [¶] Even if someone has the right-of-way, that person must use reasonable care to avoid an accident."

The jury was instructed pursuant to Vehicle Code section 21801. Subdivision (a) provides: "The driver of a vehicle intending to turn to the left or to complete a U-turn upon a highway, or to turn left into public or private property, or an alley, shall yield the right-of-way to all vehicles approaching from the opposite direction which are close enough to constitute a hazard at any time during the turning movement, and shall continue to yield the right-of-way to the approaching vehicles until the left turn or U-turn can be made with reasonable safety." Subdivision (b) provides, "(b) A driver having yielded as prescribed in subdivision (a), and having given a signal when and as required by this code, may turn left or complete a U-turn, and the drivers of vehicles approaching the intersection or the entrance to the property or alley from the opposite direction shall yield the right-of-way to the turning vehicle."

The jury was instructed with CACI No. 704. "The statute just read to you uses the word 'hazard.' A 'hazard' exists if . . . any approaching vehicle is so near or is approaching so fast that a reasonably careful person would realize that there is a danger of a collision or accident."

They were further instructed, "A person must drive at a reasonable speed. Whether a particular speed is reasonable depends on the circumstances such as traffic,

16

weather, visibility and road conditions. Drivers must not drive so fast that they create a danger to people or property. [¶] If Maria Olivo has proved that Jeffrey Townsend was not driving at a reasonable speed at the time of the accident, then Jeffrey Townsend was negligent. [¶] The speed limit where the accident occurred was 40 miles per hour."

Maria brought a motion for new trial and judgment notwithstanding the verdict (JNOV). One of the grounds was that the way the jury was instructed, it amounted to strict liability for making a left turn and hitting the motorcycle. The trial court noted, "You know, I rarely give special instructions. I rarely do because I hate to deviate from CACI. I'm not saying CACI is perfect. Sometimes it's incomplete. It doesn't cover all circumstances. So I rarely even allow special instructions. Be he did show me case law that had that exact same language."

2.     *ANALYSIS*

"To establish negligence, it must be shown that (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached that duty, and (3) the breach was a proximate or legal cause of the plaintiff's injuries." (*Gilmer v. Ellington* (2008) 159 Cal.App.4th 190, 195 (*Gilmer*).) "In California, Vehicle Code section 21801 . . . governs the respective duties of drivers of left-turning vehicles and those of approaching vehicles." (*Id.* at p. 196.)

In *Kirk*, *supra*, 202 Cal.App.2d 288, a driver, Karen, was making a left-hand turn. There were two opposing lanes of traffic and the driver in the number one lane motioned for her to go ahead and make her left turn. However, a car was approaching in the number two lane and Karen collided with that vehicle. (*Id.* at p. 290.) The issue in *Kirk*

17

was whether Karen had failed to properly yield to the approaching vehicle in lane number two. (*Id.* at pp. 290-291.)

In *Sesler*, *supra*, 219 Cal.App.3d 218, the plaintiff was traveling south when he stopped his motorcycle in a left turn lane and waited for traffic to clear in the three oncoming lanes; the cars in oncoming lanes numbers one and two stopped and motioned for the plaintiff to proceed with his left-hand turn in front of them. Seeing no hazard in lane number three, the plaintiff commenced his turn; but the defendant, who had been traveling north in lane number one, had moved to lane number three to avoid the cars he saw stopped in front of him and he collided with the plaintiff in the intersection. (*Id.* at pp. 224, 268.) The issue on appeal was whether the motorist who waived the plaintiff to commence his turn dictates that the waiver applies to any other motorist. (*Id.* at p. 220.)

Both *Sesler* and *Kirk* reached the following conclusion, "[Vehicle Code] [s]ection 21801, subdivision (a) has been construed to mean that 'if the oncoming vehicle in the lane closest to the left turning vehicle surrenders its right of way by indicating to the operator of the left turning vehicle that it desires him to proceed, such operator may not proceed beyond that first lane of traffic, now effectively blocked by the waiving vehicle, if in fact other vehicles approaching in any of the other oncoming lanes will constitute a hazard to the left turning vehicle during the turning movement. [Citation.] Pursuant to subdivision (b) of section 21801, the burden shifts to oncoming traffic to yield the right-of-way to the left-turning driver only where the left-turning driver has complied with section 21801, subdivision (a) but is forced to stop midturn for some reason beyond the

18

driver's control." (*Gilmer*, *supra*, 159 Cal.App.4th at pp. 196-197; *Kirk*, *supra*, 202 Cal.App.2d at p. 291; *Sesler*, *supra*, 219 Cal.App.3d at p.p. 223-224.)

In *Gilmer*, *supra*, 159 Cal.App.4th 190, the court found the following rules applied to left-hand turns, pursuant to *Sesler*, *Kirk*, and Vehicle Code section 21801 "(1) approaching vehicles in oncoming traffic that are close enough to constitute a hazard to a left-turning vehicle, have the right-of-way over that left-turning vehicle; (2) a left-turning driver has a duty to ascertain whether an approaching vehicle constitutes a hazard and, if so, to yield the right-of-way to that approaching vehicle; (3) such duty continues throughout the turning maneuver and applies to each approaching vehicle in each successive lane of oncoming traffic; and (4) even where the driver of an approaching vehicle yields its right-of-way, the left-turning driver has a continuing duty to anticipate that other drivers will not yield their right-of-way; i.e., the left-turning driver may not treat one driver's yielding as a yielding of the right-of-way of any other approaching vehicle." " (*Gilmer*, *supra*, 159 Cal.App.4th at p. 198.)

Based on the language in *Gilmer*, the trial court here properly gave the Special Instruction. The evidence established that there were two traffic lanes going east on Chapman Avenue. The evidence also established that at least two cars traveling in those lanes were slowing or stopped and Maria proceeded to turn left. However, even though those cars had stopped, she still had an ongoing duty to check that there was no further hazards to making her left-hand turn. This reasonably included a motorcycle either splitting lanes or going around another vehicle. Townsend interprets both *Sesler* and *Kirk* too narrowly. Here, there was ample testimony that allowed for the jurors to question

19

whether the approaching cars had stopped, whether Maria actually did not see Townsend, and also in determining if Townsend presented a hazard.  The jury was properly instructed in accordance with *Sesler*, *Kirk*, and *Gilmer.*

Further, the Special Instruction did not advise the jurors that no matter what Maria did, she was responsible for the accident because she was making a left turn.  The specific language provided, "If any approaching vehicle is *close enough to constitute a hazard* at any time during the turning movement, then the left-turning driver continues to have a duty to yield the right-of-way to that approaching vehicle *even if other vehicles yielded their right-of-way to the left-turning driver*."  (Italics added.)  Instead, the instruction went to the fact that if the two cars in the number one and number two lanes were slowing or stopping, that did not absolve Maria of making sure no other cars, or a motorcycle, or even a pedestrian, created a hazard.  The jury still had to determine whether Townsend presented a hazard and whether Maria used reasonable care in not yielding to him.  While *Sesler*, *Kirk*, and *Gilmer* did not involve motorcycles, it is a logical extension that a hazard may be present from a motorcycle that is lane splitting even though the cars in the lanes appeared to be yielding.

Maria concludes the instruction advised the jurors that she was strictly liable for "any" collision that occurred while she was turning left.  She insists that the instruction advised the jurors that she was "strictly liable for any collision in the Intersection with any approaching vehicle while she was making her left turn, because any and all approaching vehicles as a matter of law had the right of way—no matter what they were

20

doing:  speeding, lane-splitting, darting out from behind a vehicle in front, or even running a red light."

The instruction simply did not advise the jurors Maria was strictly liable.  It advised the jurors that even if the cars in the number one and number two lanes on east Chapman slowed, she was responsible for making sure that no further hazard existed.  Again, the instruction used the language that if any vehicle was close enough to present a hazard, she had a duty to yield the right-of-way.  The jury had to determine if Maria exercised the proper care in making her left-hand turn by assessing the potential hazards; it did not automatically make her responsible for colliding with Townsend.  Further, CACI No. 704 which defined "hazard" and the Vehicle Code instruction provided further instruction on Maria's duty to yield only to those cars that presented a hazard by approaching so near or moving so fast that a "reasonable person" would realize there was a danger of collision.  The Special Instruction did not advise the jurors that Maria was strictly liable for the accident.

B.    EXPERT TESTIMONY

Maria contends the trial court erred by admitting the testimony of Dr. Schobert regarding Townsend's future medical costs, specifically, the need for prosthetic devices and their cost.  She insists that all of Dr. Schobert's testimony regarding the cost was inadmissible hearsay and improper expert opinion pursuant to *Sanchez*, *supra*, 63 Cal.4th 665.  As such, this court should reverse the denial of Maria's motion for new trial for the future medical costs.

21

1. *ADDITIONAL FACTUAL BACKGROUND*

At the beginning of Dr. Schobert's testimony, as stated, he explained that he had to do research on prosthetics. He told the jury he had spoken with two persons including an executive at a prosthetic manufacturer and a local doctor who specialized in the fitting and use of prosthetic devices. Maria's counsel objected that this was all hearsay but the trial court made no ruling. Dr. Scholbert then testified that Townsend would need at least two prosthetic devices and they last only two years. Maria's counsel objected on the ground it was beyond the expertise of Dr. Schobert, which was overruled. Dr. Schobert testified that he received the information about the cost of the prosthetic devices from the manufacturer and confirmed with the local prosthetist. Dr. Schobert was asked what the cost per year would be for Townsend's prosthetic. Maria's objection as hearsay and beyond expertise was overruled. Dr. Schobert then testified the cost would be $22,000 each year for Townsend's lifetime.

After the evidence was concluded, Maria's counsel filed a request to have the testimony of Dr. Schobert regarding the prosthetic devices stricken, particularly the assessment of cost and the need. The trial court stated, "But you know, an orthopedist or somebody who does a lot of amputations probably has a good idea of what prosthetics people use, what prosthetics cost, things of that nature. [¶] I'm not saying that he's an orthopedist who does a lot of amputations. But, you know, you don't need an expert to tell you regarding what crutches cost or medical supplies; right? [¶] I mean, when a doctor gets up there and says crutches cost $200 or $300, you're not going to object because he's not a medical supply salesman, are you? I mean, he's a doctor. [¶] . . . I

think he's amply qualified to testify regarding what prosthetics cost or at least talk about the range of what prosthetics cost without actually calling an expert or prosthetist to testify." Maria's counsel countered that Dr. Schobert admitted his knowledge came from talking to the manufacturer and another prosthetist. He just "regurgitated some hearsay." The trial court responded that a doctor obviously knows what a Band-Aid and other medical apparatus cost and denied the motion to strike.

After the jury awarded Townsend $1,140,000 in future medical costs, Maria brought a motion for new trial and JNOV on the ground that Dr. Schobert's testimony regarding prosthetic devices should have been excluded.[5] Townsend filed opposition to the motion for new trial arguing that Maria had waived any objections to Dr. Schobert's testimony by failing to object at trial and that Dr. Schobert was qualified to testify on prosthetic devices. The JNOV and motion for new trial were heard on June 12, 2019. The trial court noted that "it seems to be that [Maria's counsel] focuses mostly on Dr. Schobert's testimony regarding the prosthetics. You know, there has been a lot of new case law with respect to what experts can say, how far they can opine, what areas they can opine on." The trial court recognized the *Sanchez* case. The trial court stated, "And, unfortunately, it's not clear, you know, how far an expert can go in rendering an opinion." The trial court then concluded, "In reviewing the two different motions and going over the different bases, I don't find reason to overturn the jury's verdict in this case, so the Court would deny both the motion for new trial and the motion for JNOV."

---

[5] The written motion for new trial was not included in the record.

Maria's counsel argued that *Sanchez* required reversal of the future medical verdict because the testimony went beyond Dr. Schobert's expertise.

The trial court further elaborated that it seemed an orthopedic surgeon would have knowledge of the cost of prosthetic devices and their use. The trial court believed the testimony was within Dr. Schobert's area of expertise. Maria's counsel countered that Dr. Schobert had admitted he had no knowledge of prosthetic devices and had to contact other experts to obtain the information. The trial court responded, "All right. I think we've said everything we have to say, so we'll see what the Court of Appeal says, obviously."

### 2. *ANALYSIS*

Evidence Code section 801 provides as follows: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

Recently, the California Supreme Court set forth distinct rules for expert testimony in *Sanchez*.[6] "An expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so . . . Evidence Code section 802 properly allows an expert to relate generally the kind and source of the 'matter' upon which his opinion rests. There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception." (*Sanchez*, *supra*, 63 Cal.4th at pp. 685-686.) It further found, "If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception. Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Id.* at p. 684, fn. omitted.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id*. at p. 676.)

The court in *Sanchez* explained, "Our decision does not call into question the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in his field. Indeed, an expert's background knowledge and experience is what distinguishes him from a lay

---

[6] "Although Sanchez is a criminal case, it also applies to civil cases." (*People v. Bona* (2017) 15 Cal.App.5th 511, 520.)

witness, and, as noted, testimony relating such background information has never been subject to exclusion as hearsay, even though offered for its truth.  Thus, our decision does not affect the traditional latitude granted to experts to describe background information and knowledge in the area of his expertise.  Our conclusion restores the traditional distinction between an expert's testimony regarding background information and case-specific facts." (*Sanchez*, *supra*, 63 Cal.4th at p. 685.)

The *Sanchez* court concluded, "In sum, we adopt the following rule:  When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay.  It cannot logically be maintained that the statements are not being admitted for their truth." (*Sanchez*, *supra*, 63 Cal.4th at p. 686.)

An order denying a new trial is appealable as a postjudgment order under Code of Civil Procedure section 904.1, subdivision (a)(2).  "The denial of a new trial motion is reviewed for an abuse of discretion." (*Minnegren v. Nozar* (2016) 4 Cal.App.5th 500, 514, fn. 7.)

Here, Dr. Schobert admitted he had performed an amputation but had no knowledge of prosthetic devices.  His only knowledge came from speaking to a vice president at a prosthetics manufacturer about the cost, and another doctor who dealt with prosthetic devices.  He had no personal knowledge dealing with a patient who he helped obtain or maintain a prosthetic device.  Further, the only evidence of the cost of the prosthetic devices and the need to replace them every two years was the testimony from Dr. Schobert.  That testimony came not from his own knowledge and expertise, but from

26

his discussions with the expert on prosthetic devices and the manufacturer. This was inadmissible hearsay. Because these foundational facts were outside of Dr. Schobert's personal knowledge, and no other witness supplied them, no hearsay exception applies. It was error to admit Dr. Schobert's testimony regarding the use and cost of prosthetic devices. (*Sanchez*, *supra*, 63 Cal.4th at pp. 676-677, 686.)

The admission of Dr. Schobert's testimony does not require us to set aside the judgment if, in light of the entire record, it is reasonably probable that Maria would have received a more favorable result had the trial court excluded the testimony. (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 254 [standard for reversal due to the erroneous evidentiary ruling].) An error may be deemed harmless if improperly admitted evidence is " 'merely cumulative or corroborative of evidence properly in the record.' " (*Id.* at p. 255.)

No other evidence was presented by Townsend to support the cost and use of prosthetic devices, as he relied on the erroneous ruling that Dr. Schobert's testimony was admissible. The only other evidence of future medical expenses was the testimony of Dr. Scolaro stating the cost of an amputation and the cost of ankle surgery. As such, the trial court should have granted Maria's motion for new trial in regards to the award of future medical expenses by the jury because it was based on the hearsay testimony of Dr. Schobert. We will reverse the denial of Maria's motion for new trial on future medical expenses and remand to the trial court for a new trial on future medical expenses from the time of the denial of the new trial motion.

## DISPOSITION

The order denying Maria's motion for a new trial is vacated only as to the future medical expenses awarded by the jury to Townsend. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER_____
                                              J.

We concur:

RAMIREZ_____
                            P. J.

McKINSTER_____
                            J.